UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                        :
JANICE ELLIG and BRUCE ELLIG,                           :
                                                        :
                                  Plaintiffs,           :
                                                        :
                  -v-                                   :
                                                        :
ALFRED MOLINA and MOLINA, INC. d/b/a                    :
MOLINA FINE JEWELERS,                                   :
                                                        :
                                  Defendants.           :
-------------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: FEB 1 0 2014 |

12 Civ. 7927 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Diamonds are not always a girl's best friend. Here, the particular diamond ring at issue—a 10-carat center stone in a platinum setting that included dozens of baguettes—drove friends apart.

The story starts with a cruise around the world, and ends in a courtroom in Manhattan. The cast of characters includes a jet-setting jeweler from Arizona; a financially conservative husband who is intent on investing wisely and who wants to (and does) buy his wife a special ring for a significant birthday, trusting in the ring's value; and a wife appreciative of the gesture, but concerned about the ring's cost and actual value. Buyer's and receiver's remorse set in; that might have been the end of the story, if it were not for the fact that the jeweler had promised that plaintiffs could return the ring within one year and that he would buy it back. In fact, plaintiffs claim that said jeweler, Alfred Molina himself, had also agreed to pay

them 10% in addition to the purchase price—in effect, guaranteeing the price of the ring and a 10% return on the investment if returned within a year.

Unfortunately, this promise was not in writing. The parties generally agree that there was a promise of some sort; but, rather unsurprisingly, disagree as to important details. This lawsuit followed; a bench trial was held on January 10, 2014. At that trial, the now former friends testified as to their version of events. This Opinion & Order constitutes the Court's findings of fact and conclusions of law.

In summary, the Court finds that, in exchange for plaintiffs' purchase of the ring, defendants agreed to buy it back at full price plus 10% if tendered within one year. By failing to hold up their end of the bargain, defendants have breached the contract.

## I.    FINDINGS OF FACT

At trial, the Elligs and Mr. Molina provided direct testimony by written declaration and were subject to live cross-examination and re-direct.[1] The Court found both of the Elligs very credible. Mrs. Ellig is an articulate and sophisticated businesswoman; her answers were consistent and direct. She was never evasive. The Court credits her testimony in toto. Mr. Ellig is also a sophisticated businessperson who is clearly very detail-oriented and careful. He was clear, consistent and articulate in Court. He was never evasive. The Court similarly credits his testimony in toto. In contrast, the Court found Mr. Molina lacking in

---

[1] Prior to the commencement of the trial, the Court invited the parties to submit any objections they might have to the written declarations. Thus, the parties were able to assert hearsay, relevance, and other objections to direct testimony, just as they would have been able to do if all testimony had proceeded live. The Court then ruled on those objections on the morning of trial. (See Trial Tr. 7–12, Jan. 10, 2014.)

credibility; he was evasive, argumentative and inconsistent. The Court does not believe his version of the agreement between the parties.

Plaintiffs and defendant Molina met on an around-the-world trip in 2007. (Decl. of Janice Ellig ("JE Decl.") ¶ 4, ECF No. 74.) He introduced himself as a world-renowned jeweler. (Decl. of Bruce R. Ellig ("BE Decl.") ¶ 5, ECF No. 75.) Mr. Molina is the sole shareholder in Molina, Inc., which operates two jewelry stores under the name Molina Fine Jewelers ("MFJ"). (Trial Decl. of Alfred Molina ("Molina Decl.") ¶ 3, ECF No. 77.) The Elligs and Mr. Molina became close friends and socialized together with Mr. Molina's then wife. (JE Decl. ¶¶ 5–6.) Mr. Molina was a regular guest in the Elligs' home when he came to New York for business. (Id. ¶ 8.) Mr. Molina would use the word "brother" when he contacted Mr. Ellig regarding a prospective visit—stating, for instance, "Hey, brother, I am coming to visit you and will arrive on ____." (BE Decl. ¶ 7.) The Elligs and Molinas also travelled together to Eastern Europe, Sicily and the Caribbean. (JE Decl. ¶ 9.)

During the time the Elligs and Molinas spent together, Mr. Molina spoke about diamonds as an investment. (BE Decl. ¶ 9.) Mr. Ellig considers himself fiscally conservative. (Id.) He has invested primarily in municipal bonds. (Id.) He conveyed this to Mr. Molina on a number of occasions. (Id.)

Mrs. Ellig's 65th birthday was in 2011. In December 2010, Mr. Ellig told Mr. Molina that Mrs. Ellig's 65th birthday was approaching, as was their 17th wedding anniversary, and that he wanted to do something special to mark those occasions. (BE Decl. ¶ 10.) Mr. Molina suggested that Mr. Ellig buy her a large diamond ring.

3

(Id.) Mr. Molina stated that diamonds appreciate and therefore were a safe investment. (Id.) Mr. Ellig was initially skeptical; he was contemplating a gift in the range of a couple of hundred thousand dollars, and Mr. Molina told him that a large diamond befitting his wife would cost three times that amount. (BE Decl. ¶ 11.) Mr. Ellig told Mr. Molina that if he were even to consider spending that kind of money, the purchase would have to be not only a gift but also an investment. (Id.)

Mr. Ellig stated that, as much as he wanted to do something special for his wife, the appropriateness of the investment depended on his ability to get his money back. (BE Decl. ¶ 12.) In that very first conversation in December 2010, Mr. Molina stated that, if the Elligs purchased the ring and were unhappy with it for any reason at all, he would buy it back within a year for the full purchase price plus a guaranteed 10%. (Id. ¶ 13.) The agreement was not reduced to writing. Mr. Ellig and Mr. Molina had a number of conversations about the ring following this first one, and in each, Mr. Molina repeated the benefits of investing in diamonds and the guarantee he was providing. (Id. ¶¶ 15–16.) In each of these conversations, the terms of the guarantee remained the same. (Id. ¶ 16.)

At no time prior to the Elligs' purchase of the ring—and indeed not until July 2012—did Mr. Molina mention a consignment arrangement or a waiting period before their money would be returned. (See BE Decl. ¶¶ 16–17.)

As her birthday approached, the Elligs discussed the possibility of Mr. Ellig buying his wife a diamond ring. (JE Decl. ¶ 15; BE Decl. ¶ 19.) The Elligs never discussed purchasing a loose diamond (that is, a diamond not yet set into a ring or

4

other piece of jewelry); their discussions always related to a wearable diamond ring. (JE Decl. ¶ 21.)

Mrs. Ellig then spoke with Mr. Molina about acquiring a ring with a diamond in the 8-to-10 carat range. (JE Decl. ¶ 16.) Mrs. Ellig informed Mr. Molina that their budget was $300,000 to $350,000. (Id.) During April to June, the conversations became more serious. (Id. ¶ 17.)

Prior to receipt of the ring, Mrs. Ellig had a conversation with Mr. Molina in her kitchen in which she expressed to Mr. Molina her concern that, given the price of the ring, she had to be certain it was a good investment. (Trial Tr. 40, Jan. 10, 2014.) Molina told her in substance not to worry, that diamonds were an investment that did not lose value, and that he would repurchase the ring and guarantee another 10% if the Elligs were not happy with it. (Tr. 40–41.) Mrs. Ellig testified credibly at trial that Mr. Molina repeated his promise to buy the ring back (plus 10%) on multiple occasions. (JE Decl. ¶ 19.) The Elligs subsequently agreed to buy a ring for over $700,000. (Id. ¶¶ 25–26.) They both testified credibly that they did so in reliance on the specific and repeated representations by Mr. Molina regarding the buy-back promise. (Id. ¶¶ 21, 23.)

On June 21, 2011, Mr. Molina came to Manhattan with a ring with a more than 10-carat diamond center stone; he showed it to Mrs. Ellig. (JE Decl. ¶ 24; BE Decl. ¶¶ 21, 23.) The diamond was in a setting when Mr. Molina first showed it to her. (Tr. 64–65; JE Decl. ¶ 24.) Mrs. Ellig had some concerns about clarity and expressed them to Mr. Molina. (BE Decl. ¶ 20.) Mr. Molina stated that the ring

5

was a good deal, and that what she was noticing was its blue fluorescence, which made it even more valuable.  (Id.)  At trial, Mr. Molina maintained that the blue fluorescence was an advantage and added value.  (Molina Decl. ¶ 11.)

To address Mrs. Ellig's clarity concerns, Mr. Molina suggested boiling the ring; when Mrs. Ellig was still dissatisfied with the color of the ring, Mr. Molina suggested the addition of baguettes in the setting.  (BE Decl. ¶¶ 21–22.)

Mr. Ellig paid for the diamond stone and the setting in two separate payments: he wired Mr. Molina $580,000 on June 21, 2011, and $71,188 on June 30, 2011.  (BE Decl. ¶¶ 23–24.)

The Elligs' negotiations regarding purchase of the ring and the terms of return were solely with Mr. Molina; he made statements to them as an individual and not purporting to act through or on behalf of a corporate entity.  However, the invoices for the ring were in the name of Molina Fine Jewelers, and the payments sent for the ring were to Molina Inc.  (See PX1, PX2, PX12, DX1–DX4.)  The Court finds that Mr. Molina made a personal promise that he and/or his wholly owned company—acting with regard to the ring indistinguishably—would buy back the ring within one year.

Mr. Molina did not leave the ring behind, but returned with it to Arizona, where a new setting was designed.  (JE Decl. ¶ 29; BE Decl. ¶ 22.)  The ring in the form in which it currently exists was finished and presented to Mrs. Ellig in late July or early August 2011; this was approximately two to three weeks after he showed the original ring to Mrs. Ellig.  (Tr. 51–52; JE Decl. ¶¶ 28–29.)  Mr. Molina

6

provided the Elligs with a valuation by Mr. Molina himself, which they could use for insurance purposes, which valued the ring for $925,000.  (BE Decl. ¶¶ 25–26.)

Shortly after receiving the ring, Mrs. Ellig began to have misgivings.  She continued to be bothered by the center stone's strong blue fluorescence.  (JE Decl. ¶ 30.)  She expressed her concerns to Mr. Molina soon after she received it; he told her that the blue fluorescence made the ring whiter.  (Id.)

Over the course of the next 10 months, Mrs. Ellig's concerns about the color of the ring continued.  (Id. ¶ 33.)  She had several people she believed were knowledgeable in the area provide her with their views as to the value of the ring; their valuations came in at a number far lower than the Elligs had paid.  (JE Decl. ¶¶ 34, 37.)  During the holiday season of 2011, Mrs. Ellig informed Mr. Molina of the third-party opinions regarding the ring's value; their relationship began to sour. (Id. ¶¶ 36–37.)  In May 2012, Mrs. Ellig and Mr. Molina were both in attendance at a shareholders' conference in Omaha, Nebraska.  (Id. ¶ 39.)  Mrs. Ellig and Mr. Molina visited a jewelry store in town, and Mrs. Ellig was struck by how her ring compared to others at lower prices; she believed hers lacked the same sparkle.  (Id.) Later that same month, the Elligs decided to return the ring.  (Id. ¶ 41.)  She called Mr. Molina at the end of May or beginning of June 2012 and informed him of that decision.  (Tr. 61; JE Decl. ¶ 41; BE Decl. ¶¶ 29–30.)

On July 11, 2012, Mr. Molina sent the Elligs a letter, which was referred to throughout the trial as the "Dear Brother letter."  (JE Decl. ¶ 42.)  That letter confirms that the parties had an agreement with respect to the return of the ring.

7

(See id.)  The letter provided a chronology of the Elligs' purchase of the ring.  It states that Mr. Molina presented the "diamond" to Mrs. Ellig in June and that she subsequently wanted changes to the setting. (Tr. 46–48; JE Decl. ¶ 42.)  At trial, Mr. Molina testified that he had never presented Mrs. Ellig with a loose stone. (Tr. 116–17.)  The letter reads in relevant part as follows:

> When we discussed the risk of you purchasing the diamond, I made several statements to both of you.
>
> 1. If you decide that you do not want the diamond a year from now, I would get your money back and a 10% return on your money.  I understand that is your understanding that I committed to buy the stone and you are correct. The only gray area is that for me to do so I have to sell the stone.  (I am prepared to provide you with a financial note that guarantees the funds and a return.)

(JE Decl. ¶ 42; BE Decl. ¶ 31; PX4.)

The "gray area" referred to in the letter (selling the diamond prior to giving the Elligs their money back) was not part of the original agreement between the parties.  (BE Decl. ¶ 32.)  Mr. Ellig testified credibly that a consignment arrangement emerged for the first time after the Elligs told Mr. Molina that they wanted to return the ring.  Mr. Molina initially explained the need to sequence the events in this manner as due to a lack of immediate funds on his part.  (Tr. 75.)  The Court agrees that any consignment arrangement was an ex post facto attempt to avoid the terms of the guarantee that Mr. Molina had made to the Elligs.

Mr. Ellig declined to provide the ring—even with the financial guarantee offered—prior to receiving full payment. (Tr. 84–86.)  At trial, he explained that he is a conservative investor, and that he did not want and had not bargained for the

uncertainty that came with such an arrangement. (Tr. 86; BE Decl. ¶ 9.) In addition, Mrs. Ellig stated that she knew that Molina had debts and was concerned that if he sold the ring, the proceeds could be used to satisfy some other creditor. (JE Decl. ¶ 47.)

On July 12, 2012, Mr. Molina sent the Elligs a consignment agreement along with a guarantee of payment over time upon return of the ring. (JE Decl. ¶ 44; BE Decl. ¶ 33.) The Elligs did not enter into this agreement.

At trial, Mr. Molina testified that in his 45 years in the jewelry business, he has never promised or agreed to buy back any jewelry. (Molina Decl. ¶ 39.)[2]

II.   CONCLUSIONS OF LAW

This is a straightforward breach of contract case: is there an enforceable buy-back guarantee between the parties and, if so, what are its terms?

Plainly, resolution of this dispute would have been far easier had the agreement between the parties been in writing at the outset. A clear writing would have provided certainty as to terms and therefore clarity as to breach. Neither party disputes that there was an oral agreement—but, as is clear from the above, they disagree as to certain provisions. Defendants argue that the lack of a writing at the outset dooms plaintiffs' claim: the statute of frauds requires, inter alia, contracts over a certain value or which cannot be completed within one year to be in

---

[2] At trial, defendants also proffered the testimony of Daniel Ribacoff as an industry expert on whether jewelers typically enter into repurchase guarantees. (Trial Decl. of Daniel Ribacoff, ECF No. 76.) On cross-examination, it became clear that, while Ribacoff has experience in the wholesale side of the jewelry business, he does not have sufficient familiarity on the retail side to be helpful to the finder of fact. In addition, he testified that he was unaware of the repurchase policies of high-end jewelry stores, which Molina had testified constituted his peer group. (See, e.g., Tr. 182–85.) The Court therefore declines to rely on any opinion from Ribacoff.

writing.  See N.Y. U.C.C. § 2-201(1) (explaining that "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought"); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 782 (2d Cir. 2003).  The Elligs find themselves in the rather lucky position of having a confirming writing, with Mr. Molina's signature, that satisfies the statute of frauds: the "Dear Brother" letter is all that they need in this regard.  Defendants also argue that the letter is not admissible under Federal Rule of Evidence 408 or that it cannot satisfy the statute of frauds, since the parties disagree as to whether the terms of the buy-back are accurately set forth in the letter.  These arguments are both unavailing.

     A.    The Contract

     Was there a contract between the parties?  In order to establish the existence of a contract, a party must demonstrate that there was an offer and acceptance, in exchange for value—or consideration.  Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004).  A promise without consideration is, of course, not a contract but simply a promise.  See Int'l Paper Co. v. Suwyn, 951 F. Supp. 445, 448 (S.D.N.Y. 1997).

     To establish a breach of contract, plaintiffs must show the existence of an agreement between the parties, that they performed their obligations, that the other party failed to perform, and damage resulting therefrom.  Eternity Global

Master Fund Ltd. v. Morgan Guar. Trust. Co. of N.Y., 375 F.3d 168, 177 (2d Cir.
2004).

Here, there is no doubt that there was a contract between plaintiffs and
defendant: defendants offered to sell a diamond ring with a buy-back guarantee to
plaintiffs in exchange for $651,188. (See BE Decl. ¶¶ 23–24.) Plaintiffs paid the
price required, but defendants have failed to fulfill the guarantee.[3]

B.   Statute of Frauds

Defendants' primary legal argument is that the statute of frauds requires a
written contract, and that the lack of a written contract between the parties here
therefore renders any promises unenforceable. Plaintiffs bear the burden of
overcoming any statute of frauds requirement. See Trebor Sportswear Co., Inc. v.
The Limited Stores, Inc., 865 F.2d 506, 509 (2d Cir. 1989). To carry this burden,
plaintiffs must present sufficient admissible evidence of an agreement. Id. at 510.
All that is required is that there is a writing that affords a basis for believing that

---

[3] At trial, counsel for defendants made some vague arguments that it might be the case that there
was no "meeting of the minds." (Tr. 28, 31–32, 193–94.) It was unclear to what doctrine counsel
intended to refer. Whether or not a "meeting of the minds" occurred generally goes to whether a
contract existed or not. See, e.g., Prince of Peace Enters, Inc. v. Top Quality Food Market, LLC, 760
F. Supp. 2d 384, 397 (S.D.N.Y. 2011) (citing cases). In some cases, courts use the term "meeting of
the minds" to refer to a mutual mistake about a basic assumption of the contract, which can also
cause a contract to be voidable. See, e.g., Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.,
81 N.Y.2d 446, 453 (1993). To the extent that counsel alleged that there was a mutual mistake of
fact as to the terms of the agreement, he is incorrect; the Court has found that the consignment
agreement was an ex post facto attempt to avoid the terms of the guarantee. To the extent that
counsel was alleging that Mr. Molina had made a unilateral mistake regarding the nature of the
contract, that argument fails because such a mistake does not make the contract voidable unless the
other party was aware of the mistake as a matter of law. See Middle East Banking Co. v. State
Street Bank Int'l, 821 F.2sd 897, 906 (2d Cir. 1987). Here, even assuming that such an agreement
was not an ex post facto attempt to avoid the guarantee, the Elligs were plainly unaware that Mr.
Molina had such an understanding of the contract. As a matter of fact, however, the Court finds that
both parties understood exactly what the terms of the original argument were. There was no
mistake by any party when they entered into their agreement.

the offered oral evidence of a contract and its terms refer to a real transaction.  See Apex Oil Co. v. Vanguard Oil & Serv. Co., 760 F.2d 417, 423 (2d Cir. 1985).  A sufficient writing in this regard (1) indicates that an agreement with obligations exists between the parties, (2) is signed, and (3) specifies a quantity of goods.  See N.Y. U.C.C. § 2-201(1).  Several writings may be considered together.  See Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH, 796 F.2d 29, 30 (2d Cir. 1986).

The classic phrase "hoisted with his own petard" applies here.

Defendant Molina himself drafted and sent to plaintiffs the written instrument that lays out the chronology leading up to the agreement for the purchase and sale of one ring, concedes that a guarantee exists, and further concedes that Mrs. Ellig's version of events is "correct."  (JE Decl. ¶ 42; BE Decl. ¶ 31; PX4.)  This writing is sufficient to meet the requirements of the statute of frauds.  See Great Destinations, Inc. v. Transportes Aereos Portugueses S.A.R.L., 460 F. Supp. 1160, 1163–64 (S.D.N.Y. 1978) (finding several letters setting forth the essential terms of contracts to satisfy the statute of frauds); Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 53–54 (1953) (finding payroll cards to constitute sufficient writings under the statute although they came into existence subsequent to the contract's execution, because they contained essential elements such as the parties to the contract, the compensation to be received, and the duration of the contract); Nausch v. AON Corp., 769 N.Y.S.2d 481, 483 (App. Div. 1st Dep't 2003) (finding that documents such as a letter agreement, internal memorandum, and handwritten notes satisfied the statute of frauds).

12

To the extent that the price paid itself is contained in separate writings (the invoices tendered by Mr. Molina and the wire transfers tendered by the Elligs), the fact that they are not signed in the classic sense of bearing a personal signature is not fatal. Under the circumstances here, neither party has contested the amount paid; the wires bear indicia of reliability, as do the invoices, though the date upon which the invoices were sent or whether they were sent was disputed. Under these circumstances, that the purchase price is contained in separate, not-classically signed documents is nonetheless sufficient. See Babdo Sales, Inc. v. Miller-Wohl Co., 440 F.2d 962, 966 (2d Cir. 1971) (explaining that only one writing "must bear the signature of the party to be charged," while the unsigned document must "refer to the same transaction");[4] Crabtree, 305 N.Y. at 54 (explaining that "separate writings, connected with one another either expressly or by the internal evidence of subject-matter and occasion," satisfy the statute of frauds).

Defendants argue that the Dear Brother letter is inadmissible as an offer of settlement. They raised this before trial in a motion in limine. The Court denied that motion at that time, but specifically invited defendants to bring out any facts they desired at trial which would support their position that the letter was an offer of settlement. (Tr. 3–6.) Defendants failed to do so.

Rule 408 of the Federal Rules of Evidence bars the admission of most evidence of offers of compromise or settlement. See Fed. R. Evid. 408(a); Rein v. Socialist People's Libyan Arab Jamahiriya, 568 F.3d 345, 351–52 (2d Cir. 2009). However, the Dear Brother letter does not meet the basic requirements of Rule 408.

[4] Mr. Molina signed the Dear Brother letter. (See PX4 at 3.)

On its face, the letter purports to be a chronology of events and sets forth Molina's position. (See JE Decl. ¶ 42; BE Decl. ¶ 31; PX4.)  Nowhere in the letter does Molina suggest that the arrangement he presents is an offer of compromise; indeed, his position throughout the trial was that the position set forth in the letter was the only correct position, and that he had agreed to a consignment and no more.[5]  The letter was therefore not an offer of compromise but a statement of his belief as to facts.  At most, the letter sets forth a method of paying a debt owed: via consignment.  Defendants desired to sell the diamond first and pay later.

Defendants also argue that, even if admissible, the Dear Brother letter is insufficient to satisfy the statute of frauds because it lacks certain terms, including that the return needed to be exercised within a year, as well as the date from which that year would run.  In addition, defendants assert that the Dear Brother letter does not specify that there was any agreement with regard to the "setting" for the ring, as opposed to only the center diamond stone.[6]  According to defendants, the absence of clarity (no pun intended) as to whether the guarantee is with respect to the stone or the entire ring, as well as the amount of time within which the return needed to be exercised, are material terms that must be in a writing.  Put another way, while plaintiffs argue that the Dear Brother letter is a sufficient writing to

---

[5] Molina's position in the litigation, in his trial declaration and on cross-examination, was generally that there was an agreement between the parties but that it was for a consignment sale of the gem and not a buy-back guaranty for the ring (plus 10%).  (See Tr. 99–100, 112; Molina Decl. ¶¶ 40–42.)  At moments, however, he took that alternative position that there never was a contract, but that he offered the consignment arrangement as an accommodation. (Tr. 105, 119–20, 129.)  The Court has found as a factual matter that a contract between the parties existed; there was a meeting of the minds and no mistake.

[6] The Court notes that, as set forth above, Mr. Molina testified at trial that he had never presented Mrs. Ellig with a loose stone. (Tr. 116–17.)  Rather, the diamond was in a setting when Mr. Molina first showed it to her. (Tr. 64–65; JE Decl. ¶ 24.)

14

constitute confirmation of a contract, they then disagree with the terms of the letter.

Under these circumstances, the issue becomes: if the letter satisfies the statute of frauds, must this Court take as true the additional terms of the contract as reflected in the letter?  No.  See, e.g., Nausch, 769 N.Y.S.2d at 483. While the Dear Brother letter is sufficient to confirm the contract between the parties—because it contains the essential terms related to Mr. Molina's commitment to buy the stone within a year—the terms expressed in the letter relating to a "gray area" do not, and need not for purposes of the statute of frauds, form part of the contract. Rather, the oral contract, whose existence the letter confirms, obligated defendants to buy back the ring within one year for the purchase price plus 10%.

C.    Compliance With Terms of the Contract

The contract between the parties obligated defendants to buy back the ring within one year for the purchase price paid plus 10%.  As a matter of fact, the Court has found that such a contract existed and meets the requirements of the statute of frauds.  It is uncontested that defendants have failed to fulfill those repurchase obligations.

Defendants argue that, even if the contract exists and even if the Dear Brother writing is sufficient to satisfy the statute of frauds, plaintiffs did not tender the ring within one year, and they therefore have no repurchase obligation. Defendants are incorrect.

15

The parties agree that any obligation ran for a one-year period, but dispute the date when that period began to run. Of course, if the contract had been written, there might have been an "effective date" defined—yet another reason prudence supports writings for important business matters. The absence of an explicit statement as to the date that the one-year period begins to run is not, however, fatal to plaintiffs' claim. There are many cases in which courts are required to make judgments as to when a time period commences or ends. See, e.g., Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007); Lituchy v. Guinan Lithographic Co., 400 N.Y.S.2d 158, 159 (App. Div. 2d Dep't 1977).

The Court looks to general principles of contract interpretation to decipher the meaning of the terms of even an oral contract. See, e.g., Dimario v. Coppola, 10 F. Supp. 2d 213, 224–25 (E.D.N.Y. 1998); Weiss v. Weiss, 735 N.Y.S.2d 582, 583 (App. Div. 2d Dep't 2001). Here, it is only reasonable to assume that the one-year period began to run from the date on which the Elligs received the ring that they later tendered back to Mr. Molina: in late July or early August 2011. (Tr. 51–52; JE Decl. ¶¶ 28–29.) Prior to that, a ring had been made, but the Elligs did not accept it; it was sent back with Mr. Molina, who changed the setting. (JE Decl. ¶ 29; BE Decl. ¶ 22.) The ring the Elligs received in late July or early August 2011 was a different "ring" from the one that was shown to them on June 21, 2011; though the center stone was the same, there were 198 baguettes added and other changes. (Tr. 51–52; JE Decl. ¶¶ 28–29; BE Decl. ¶¶ 21–22; DX4.) It would therefore be unreasonable to interpret the one-year period of the contract, which allowed for

16

return of the ring, as beginning at any time other than in late July or early August 2011, when the Elligs actually received the ring that was to be returned. <u>See H. Sand & Co. v. Airtemp Corp.</u>, 934 F.2d 450, 453–54 (2d Cir. 1991).

At the end of May or beginning of June 2012, Mrs. Ellig informed Mr. Molina that she wanted to tender the ring back to him. (Tr. 61; JE Decl. ¶ 41; BE Decl. ¶¶ 29–30.) This followed Mrs. Ellig's expression of dismay to Mr. Molina at the shareholders' meeting in May. (<u>Id.</u> ¶¶ 36–37, 39.) She did not state at that time that she wanted him to repurchase the ring. (<u>See id.</u>) Nonetheless, Mrs. Ellig's notification to Mr. Molina at the end of May or beginning of June 2012 that she wanted to return the ring certainly fell within a year after the date in late July or early August 2011 when Mr. Molina tendered the ring.[7]

D.     Liability for Both Defendants

Both defendants—Alfred Molina in his individual capacity and Molina, Inc. d/b/a Molina Fine Jewelers—have breached their contract with the Elligs, and both defendants are liable to them. As set forth above, Mr. Molina negotiated personally with the Elligs regarding their purchase of the ring. (<u>See, e.g.</u>, JE Decl. ¶ 16; BE Decl. ¶¶ 10–17.) However, the invoices for the ring were in the name of Molina Fine Jewelers, and the payments sent for the ring were to Molina Inc. (<u>See</u> PX1, PX2, PX12, DX1–DX4.) Under the circumstances of this case, Mr. Molina is

---

[7] During cross-examination, Mrs. Ellig testified that, while she could not recall the exact date, she could have spoken to Mr. Molina in "the end of May, beginning [of] June," but she doubted that she did so in mid-June, and that she did not do so in early July. (Tr. 60–61.) In his declaration, Mr. Molina testified that Mrs. Ellig stated her desire to return the ring on July 3, 2012. (Molina Decl. ¶ 51.) Even if Mrs. Ellig had exercised her buyback option as late as July 3, that would suffice to fall within one year after the late July/early August date on which Molina tendered the ring.

indistinguishable from the corporate identity of his wholly owned company.  See

Billy v. Consol. Mach. Tool Corp., 51 N.Y.2d 152, 163 (1980).  The attempt to

distinguish between them now fails.

III.    CONCLUSION

For the reasons set forth above, the Court finds that defendants Alfred

Molina and Molina, Inc. d/b/a Molina Fine Jewelers have breached their contract

with plaintiffs Janice and Bruce Ellig.  Plaintiffs shall submit a proposed judgment

within seven days, or by **Monday, February 17, 2014**.

SO ORDERED.

Dated:      New York, New York
            February 10, 2014

                                            KATHERINE B. FORREST
                                            United States District Judge